IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| DAVID SEYFRIED AS NEXT FRIEND OF DELORES SEYFRIED AND DAVID SEYFRIED, INDIVIDUALLY, | § § § § | |
| *Plaintiffs,* | § § | |
| | § | Civil Action No. 4:13cv560 |
| v. | § § | |
| CITY OF LEWISVILLE POLICE DEPARTMENT, SGT. COURTNEY LETALIEN, GEORGE REED, MICHAEL MOORE, C. CASSELS, CYNTHIA COYLE, AND CPT. EDWARD JARRETT, | § § § § § § | |
| *Defendants.* | § § | |

## REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE ON DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

## I.    BACKGROUND

The following statement of background is compiled and condensed from Plaintiff's[1] First Amended Complaint ("FAC") (docket entry #20) and the pleadings and responses filed in this case related to the instant Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (docket entry #26) (the "MTD/MSJ").

Plaintiff alleges that his wife, Delores[2], was at the time of the incident that is the subject of

---

[1] The Court will refer to "Plaintiff" throughout this Report and Recommendation ("R&R"), meaning David Seyfried as next friend to his wife, Delores Seyfried, and on his own behalf, individually.

[2] Also referred to as "Lori" in several documents, including the reports of the Lewisville Police Officers involved in the events herein and who are named as Defendants. Plaintiff's Declaration

the complaint a 68[3] year-old woman suffering from Alzheimer's disease.  The couple lives in Lewisville, Texas, and their home is the site of the incident involving the Lewisville Police Department.

On May 29, 2013, Mrs. Seyfried had become agitated with Plaintiff, her husband, and apparently threatened him with a "four-five inch letter opener" she held in her hand, resulting in a struggle over the letter opener.  At some point, Plaintiff received a scratch on his right arm; whether the scratch was imparted by the letter opener or by some other means is not resolved in the pleadings.  The evening before, he had called the National Alzheimer's Association regarding his wife, who apparently relayed the substance of the call to the Dallas Alzheimer's Association ("DAA").  The afternoon of May 29, 2013, Plaintiff called the DAA seeking assistance in resolving his wife's agitation.  The DAA, apparently unbeknownst to Plaintiff, called the Lewisville Police Department via a 911 call and advised them of the situation.   In the course of this relayed call, the Lewisville Police were advised that Mrs. Seyfried was an Alzheimer's victim who was agitated and was holding a letter opener;  that she had dementia;  that Plaintiff was intoxicated[4];  that Plaintiff kept a gun in the house;  and that a stabbing had occurred.  The

---

attached as Exhibit 1 to his Response (docket entry #34) to the MTD/MSJ (the "Seyfried Decl.") clarifies that Delores is also called "Laurie."   Seyfried Decl. at ¶ 1.

[3]  In the FAC, Mrs. Seyfried is alleged to be 67 years old as of the date of filing, January 6, 2014.  Elsewhere, including in the police reports and Plaintiff's Response to the MTD/MSJ, she was reportedly 68 years old at the time of the incident, May 29, 2013.

[4]  In his Response to the instant Motion to Dismiss, Plaintiff categorically denies that he had been drinking or was intoxicated the afternoon of May 29, 2013; he admits that he had had a drink of bourbon the night before.   Seyfried Decl. at ¶ 2.   The police reports associated with the incident reflect that Plaintiff had told the DAA that he had been drinking all night and the DAA informed the Lewisville Police Department dispatch via 911 that Plaintiff was intoxicated.   Lieutenant Michael Moore, who responded to the scene after Officer Reed and Sergeant Letalien, and who attempted to talk to Plaintiff, attested in his declaration (Ex. 5 to the MTD/MSJ, the "Moore

Lewisville Police dispatched officers to perform a "welfare concern" check at the DAA's request, but without Plaintiff's knowledge or consent.[5]

Lewisville Police Officer George Reed and Sergeant Courtney Letalien, among others, were dispatched to perform the welfare check. The substance of the DAA's 911 call was transmitted for display on the officers' in-vehicle computers. Prior to arrival, Sergeant Letalien and Officer Reed coordinated their strategy in response to the report of potential violence. Sergeant Letalien was armed with a less lethal shotgun[6] and Officer Reed with a Taser. Upon arriving at the Seyfried home the afternoon of May 29, 2013, the two attempted contact with persons inside the home via the front door, but there was no answer. Sergeant Letalien then took a position in the home's front yard while Officer Reed found Plaintiff at the back yard gate.[7]

Plaintiff was displeased with the arrival of the police and voiced his displeasure. Officer Reed asked if he was injured and Plaintiff showed him a cut on his right forearm or wrist.[8] Officer Reed directed him to go to the front yard, which he did. When Plaintiff saw Sergeant

---

Decl.") that he "detected a strong odor of alcoholic beverage on Mr. Seyfried's breath," observed that he had bloodshot watery eyes and slurred speech, and concluded that he was intoxicated. Moore Decl. at ¶ 15.

[5] DAA employee Lindsay Regen called the Lewisville Police 911 dispatcher while another DAA employee talked with Plaintiff over the phone. The 911 call was recorded and has been submitted via CD as Exhibit 1 to the MTD/MSJ.

[6] An orange-colored type of shotgun that fires bean bag rounds.

[7] Plaintiff asserts he and Officer Reed were "outside the backyard of the house." Seyfried Decl. at ¶ 4. Officer Reed asserts he found Plaintiff at the backyard gate attempting to jam his car keys into the gate locking mechanism, apparently in an effort to jam the mechanism shut to prevent Mrs. Seyfried from being able to open the gate from the inside. Reed Decl. at ¶ 9. Plaintiff does not address that particular contention.

[8] Officer Reed described it as "a fresh, bleeding cut on his arm. He told me he received it while he was 'trying to wrestle the letter opener away from [Mrs. Seyfried].'" Reed Decl. at ¶ 10. Plaintiff, on the other hand, states "I did have a scratch on my arm but it was old" and that he "never told any officer that I attempted to wrestle the letter opener away from Delores." Seyfried Decl. at ¶ 4.

Letalien armed with the orange-colored less lethal shotgun, he became more agitated and loudly, persistently and profanely demanded that she remove it. Sergeant Letalien contacted Lieutenant Michael Moore, who was also responding to the welfare concern call, and asked him to "step it up," meaning to get there fast. Lieutenant Moore responded that he was around the corner.

Officer Reed, in the meantime, from outside the fence gate, observed that the back door to the house was open and ordered anybody inside to come out. Mrs. Seyfried immediately exited the house through the door, "clinching" tightly the letter opener in her right hand and holding a padlock in her left hand.[9] Officer Reed reported that she saw him and was enraged, slobbering and gritting her teeth and yelled, "I will f...ing kill you," and advanced directly toward him holding the letter opener toward him. Reed Decl. at ¶¶ 13-14. Plaintiff was not present at that time. Officer Reed ordered her to drop the weapon, but she ignored him. He attempted to force the fence gate closed, but she was able to open it and get through it. Mrs. Seyfried advanced on Officer Reed, who was backing away until he was blocked by a parked car. He grabbed Mrs. Seyfried's right hand, holding the letter opener pointed at him, with his left hand but could not get it away from her. He attests in his declaration that she used the padlock in her left hand to beat his left wrist, and he would imminently lose control of her right hand. He attempted to fire his Taser at her, but only one of its two prongs made contact, meaning the electrical circuit could not be established. The Taser began emitting an audible sound announcing that it had not made an

___

[9] Plaintiff stated in his declaration that "I never heard about a padlock being used," Seyfried Decl. at ¶ 14, though he does not dispute it. However, in the argument of his Response, he contends that "Reed has also alleged for the first time in Defendant's Motion to Dismiss that he was struck with a padlock but of course no padlock was recovered nor mentioned in any officer's report(s)." Response at 19. He cites no evidentiary support as to whether or not a padlock was recovered; however, it is true that no post-action report mentions Mrs. Seyfried holding a padlock.

effective cycle. He then attempted to "drive-stun" Mrs. Seyfried by making direct contact with the Taser unit, but she backed away; he reloaded the Taser with another firing cartridge.

Hearing the Taser's audible alert, Sergeant Letalien ran to Officer Reed's location. Plaintiff also returned to the backyard area. Both officers shouted for Mrs. Seyfried to drop the letter opener, but she refused and advanced again on Officer Reed, still with an angry look on her face and brandishing the letter opener at him. Sergeant Letalien then fired the first of three bean bag rounds from the less lethal shotgun, hitting Mrs. Seyfried in one thigh. However, although Mrs. Seyfried exclaimed in pain, she was "unfazed" and continued her advance with the letter opener. She then apparently saw Plaintiff, then in the driveway, and became more enraged, cursing and yelling and appeared to advance toward him. Sergeant Letalien was generally in between the couple and, with Mrs. Seyfried advancing, fired the second bean bag round, hitting her other thigh. Mrs. Seyfried went down briefly (reportedly to "one knee") and then got up again and continued brandishing the letter opener.[10] Both officers were shouting at her to drop the letter opener and Plaintiff was yelling and upset.

Mrs. Seyfried then turned toward the backyard of the house. Stating that she "had no knowledge about who was in the backyard or the house" and knowing that there was a gun in the house, Sergeant Letalien fired the third and final bean bag round, hitting Mrs. Seyfried in the left buttock. Letalien Decl. at ¶ 19. She again was "unfazed" and continued toward the backyard. Sergeant Letalien then drew her Taser and fired at Mrs. Seyfried's back, hitting her in the back and

---

[10] At some point, Lieutenant Moore arrived at the scene and spoke to Plaintiff; however, he did not participate in the use of force against Mrs. Seyfried, nor does it appear that he directed Officer Reed's and Sergeant Letalien's actions. He attempted to question Plaintiff about the circumstances and who, if anyone, was inside the house, but Plaintiff refused to answer any questions.

right buttock, completing a circuit. Mrs. Seyfried fell to the ground, partly on the concrete and partly on the grass. Her right hand was then empty but her left hand was curled under her body. Officer Reed approached her and began to handcuff her, successfully placing a handcuff bracelet on her right wrist. However, Mrs. Seyfried again became combative and resisted and kicked at Officer Reed, keeping her left hand underneath her. Officer Reed believed she may have the letter opener in her left hand underneath her but could not get her left hand out. He placed his right boot on Mrs. Seyfried's right wrist to hold it down and with both hands attempted to pull her left arm out from underneath her. She continued to resist. Sergeant Letalien reached in and "gave Mrs. Seyfried a quick drive stun with my Taser to the back of her left thigh." *Id*. at ¶ 23. Officer Reed was then able to pull Mrs. Seyfried's left arm out from underneath, finding that she indeed had the letter opener in her left hand, and completed handcuffing her. At that point, the use of force ended and the officers sat Mrs. Seyfried up into a sitting position on the ground and called for the responding medical team to attend to her (an ambulance and a fire truck had arrived during these events, which reportedly took approximately two and one-half minutes, start to finish). However, Mrs. Seyfried continued to violently pull at her handcuffs, leading Officer Reed to wonder whether she would actually break the chain. Reed Decl. at ¶ 32. He removed the three Taser probes connected to her body (one from his original, unsuccessful attempt to Tase her, and two from Sergeant Letalien's successful attempt). *Id*. at ¶ 31.

Other officers had arrived by that time. Lieutenant Moore, not having obtained any answers from Plaintiff and not knowing whether any injured person was inside the house, directed Officer Reed and new arrival Officer Hayney to conduct a protective sweep through the house to make that determination. Taking Plaintiff's keys, they did so, reportedly completing the sweep of

the two-story house in five minutes or less.   After the two had started the protective sweep, Lieutenant Moore and another new arrival, Officer Coyle, entered the back door of the house to assist in the protective sweep, but encountered Officers Reed and Hayney on their way out.   They informed Lieutenant Moore and Officer Coyle that they had completed the protective sweep, finding nobody inside, and all four exited the house.

Simultaneously, the paramedics attending Mrs. Seyfried completed their initial examination and loaded her into the ambulance for transport to a hospital.   Another newly arriving officer, Officer Chessa Cassels, rode in the ambulance with Mrs. Seyfried and the paramedics.   For the safety of herself and the others, Mrs. Seyfried remained handcuffed during the transport.   Upon arrival, nursing staff took over and Officer Cassels advised them that Mrs. Seyfried was handcuffed because she had been combative.   The nursing staff talked to Mrs. Seyfried, who had no recollection of how she had been injured and apparently could not identify herself.   The nursing staff asked that the handcuffs be removed.   After Officer Cassels removed one handcuff bracelet, Mrs. Seyfried reportedly stated, "I'm gonna need a gun before I leave here." Declaration of Chessa Cassels, Exhibit 6 to the MTD/MSJ (the "Cassels Decl.), at ¶ 10.   Officer Cassels then confirmed with the nursing staff to remove the handcuffs and did so.   She took photographs of Mrs. Seyfried's injuries with a digital camera, left the hospital and returned to the Lewisville Police Department.

As the incident ended, Mrs. Seyfried was being transported and officers dispersed, Captain Jay Powell arrived at the scene, having monitored radio traffic on the incident.   He observed Plaintiff, described as "an agitated and hostile man," at the scene.   Plaintiff was standing with two neighbors in the front yard and "flipping off" the officers present, including Captain Powell.

Captain Powell spoke with Plaintiff and offered assistance in filing a complaint if he wished, but Plaintiff stated several expletives and asked that the officers leave. Captain Powell offered him a ride to the hospital, knowing that Plaintiff was intoxicated, as Lieutenant Moore had done, but Plaintiff refused. His neighbors told Captain Powell they would "keep an eye on him and give him a ride to the hospital to see his wife." Declaration of Captain Powell (Exhibit 7 to the MTD/MSJ), at ¶ 10. Captain Powell left contact information, and Plaintiff did call him a number of times the next day and beyond. However, Plaintiff never filed a complaint with Internal Affairs or otherwise before initiating the instant lawsuit. No charges were ever filed against Mrs. Seyfried, reportedly based on her status as an Alzheimer's patient.

Plaintiff filed his lawsuit on September 24, 2013. The operative document is the First Amended Complaint, filed January 6, 2014. He is suing all of the officers identified above, plus the City of Lewisville, Texas, pursuant to 42 U.S.C. § 1983 on two claims: excessive use of force in violation of the Fourth Amendment, regarding the use of force on Mrs. Seyfried during the incident, and wrongful search and seizure in violation of the Fourth Amendment, regarding the warrantless "search [of] the home of the Seyfrieds for no reason and without probable cause to do so." FAC at 9. He seeks damages, including exemplary damages, and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988. Defendants filed their answer (including a first amended answer) and filed the MTD/MSJ (docket entry #26) on February 24, 2014, with associated exhibits under other docket entries. Plaintiff filed his Response, with exhibits (docket entry #34), on March 31, 2014. Defendants filed their Reply (docket entry #36) on April 17, 2014.

## II. STANDARD

Inasmuch as this is a combined Motion to Dismiss and in the alternative, Motion for Summary Judgment, a review of both of those standards is appropriate. Defendant argues at times that dismissal on the pleadings is appropriate and at other times that summary judgment is appropriate based on the supplied evidence and argument. The Court will conduct an analysis as necessary to the arguments, but given the volume of evidentiary matter supplied outside of the operative FAC, the Court will lean toward applying the summary judgment standard.

**A.     Motion To Dismiss**

In the Fifth Circuit, "(A) motion to dismiss under rule 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (quoting *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982)). The court is required to construe the complaint liberally in favor of the plaintiff, and takes all facts pleaded in the complaint as true. *See Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986). "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Severance v. Patterson*, 566 F.3d 490, 501 (5th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)). However, in ruling on a Rule 12(b)(6) motion to dismiss, the district court cannot look beyond the pleadings, *Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir. 1994). Thus, the Court only considers matters proper under Rule 12(b)(6). *See Jones v. Liberty Bank & Trust Co.*, 461 F. App'x 407, 409 (5th Cir.) (per curiam) ("Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." (citation omitted)), *cert. dismissed*, 133 S. Ct. 32, 183 L. Ed. 2d 671 (2012).

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Rule 8 does not require "detailed factual allegations but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. Thus, a complaint will survive a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 (internal quotation omitted). A plaintiff meets this standard when it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### B.    Motion For Summary Judgment

Rule 56(a), Fed. R. Civ. P., provides that the Court may only grant a motion for summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *First American Title Ins. Co. v. Continental Cas. Co.*, - - - F.3d - - - -, 2013 WL 757655, at *2 (5th Cir. Feb. 28, 2013) (quoting Fed. R. Civ. P. 56(a)); *VRV Development L.P. v. Mid-Continent Cas. Co.*, 630 F.3d 451, 455 (5th Cir. 2011) (same). The party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). The moving party, however, "need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The movant's burden is only to point out the absence of evidence

10

supporting the nonmoving party's case. *Stults v. Conco, Inc.*, 76 F.3d 651, 655 (5th Cir. 1996). Once the moving party makes a properly supported motion for summary judgment, the nonmoving party must look beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial. *Id*. Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the nonmovant's burden. *Id*.

Summary judgment is inappropriate if the evidence before the court, viewed as a whole, could lead to different factual findings and conclusions. *Honore v. Douglas*, 833 F.2d 565 (5th Cir. 1987). The district court must look to the full record, including the pleadings, affidavits, and depositions. *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Under this standard, fact questions are considered with deference to the nonmovant. *Reid v. State Farm Mutual Automobile Insurance Co.*, 784 F.2d 577, 578 (5th Cir. 1986). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986). The court resolves factual controversies for purposes of summary judgment in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. *Little*, 37 F.3d at 1075. The court does not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. *Wallace v. Texas Tech University*, 80 F.3d 1042, 1048 (5th Cir. 1996) (citing *Little*, 37 F.3d at 1075).

"The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. An issue is "genuine" if the evidence supporting its resolution in favor of the party opposing summary judgment, together with

any inference in such party's favor that the evidence allows, would be sufficient to support a verdict in favor of the party. *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987). A "material fact" is one that might affect the outcome of the suit under governing law. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. "When the moving party has carried its burden under Rule 56(c),[1] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (footnote omitted).

Furthermore, in that this is a civil rights claim pursuant to 42 U.S.C. § 1983, "To invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lemons v. Swann*, 412 F. App'x 672, 673 (5th Cir. 2011) (per curiam) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477, 110 S. Ct. 1249, 108 L. Ed. 2d 400 (1990)).

## III. OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE

As an initial matter, the Court reviews the objections and argument the Parties have filed with regard to their respectively-filed evidentiary declarations filed in support of their summary judgment arguments.

Plaintiff first makes two objections:

Objection 1:    The declarations of officers Moore, Cassels and Coyle contain blatant hearsay and at times, double hearsay and as such, should be struck. The

---

[1]    The predecessor to the current Rule 56(a).

officers repeatedly refer to the information given them by the Dallas Alzheimer's Association ("DAA"). Information was passed from [Plaintiff] to DAA agent 1 to DAA agent 2 and then reported to the City of Lewisville Police Department. This is not credible, admissible evidence and should be struck.

Objection 2:    The declarations of Moore, Powell, Cassels and Coyle lack personal knowledge. All of the affiants continue to state that although they were not present they know what occurred, presumably based on hearsay from the other parties. Plaintiff asks this Court to strike and exclude all Declarations relying on hearsay and lacking personal knowledge.

Response at 1-2. These are extremely broad and non-specific objections, and do not identify which statements in particular either contain hearsay or are not based on personal knowledge, yet purport to seek to have the declarations stricken in full. For that reason alone, the Court would overrule them. However, the Court has reviewed each of the declarations, and the declarations of Officer Reed, Sergeant Letalien and Chief Kerbow also, and has determined that the objections are without merit for other, important reasons as well.

For example, Lieutenant Moore's declaration states that on May 29, 2013, he was in his office and heard radio traffic relating officers responding to the Seyfried residence. He further stated, "I heard reference to an Alzheimer's patient who had stabbed someone. I also recall mention that a gun was in the home." Moore Decl. at 3, ¶ 4. In context, this statement is not offered for the truth of the information Lieutenant Moore stated he heard over the radio message; it establishes his state of mind and his understanding of the situation, informing the manner in which he would respond to it. Fed. R. Evid. 803(3); *United States v. Obregon-Reyes*, 507 F. App'x 413, 424 (5th Cir.) (per curiam) (citing 2 McCormick on Evidence § 249 (6th ed. 2006) ("A statement that D made a statement to X is not subject to attack as hearsay when its purpose is to establish the state of mind thereby induced in X, such as . . . having knowledge.")), *cert. denied*, 133 S. Ct. 2369, 185 L. Ed. 2d 1088; *and cert. denied*, *Vega v. United States*, 134 S. Ct. 181, 187 L. Ed. 2d

124 (2013); *Love v. Motiva Enters. LLC*, 349 F. App'x 900, 904 (5th Cir. 2009) (per curiam).

Moreover, the Court does not take the portion of Lieutenant Moore's declaration quoted above for the truth of the information relayed from the DAA via the dispatcher, but for the effect the information had on Lieutenant Moore's state of mind. As to Plaintiff's objection as to Lieutenant Moore's personal knowledge as to what had occurred at the scene of the incident during the time prior to his arrival, the Court finds nothing in Lieutenant Moore's declaration asserting any such knowledge. Plaintiff has pointed to none. Lieutenant Moore has provided a statement of events he observed upon his arrival and through the end of the incident. At one point, in determining whether to direct a protective sweep of the premises of the Seyfried house, he stated, "It was my understanding that someone at the Seyfried home had been stabbed. I had no idea what was going on and who may be inside injured and in need of medical care." Moore Decl. at 6, ¶ 17. That is virtually identical to the hearsay exception for showing state of mind and it details, in part, why he decided a protective sweep was necessary. Moreover, Plaintiff acknowledges that the information originating from the DAA in its 911 call to the Lewisville Police Department (based on Plaintiff's conversation) was in part an impetus to Lieutenant Moore's (and the other officers') preparation and actions that day: "The information given by DAA to the City of Lewisville Police Department was not accurate. This predominately erroneous conversation has become the basis for the officer's [*sic*] use of excessive force." Response at 2.

Having reviewed the declarations of the other Defendant officers Cassels, Coyle and Powell mentioned in Plaintiff's Objections 1 and 2, the same is true of them. Plaintiff has not specifically identified any portion of each officers' declarations he believes objectionable; and, any issues of hearsay and personal knowledge are resolved in the same manner as with Lieutenant

Moore's, immediately above.

Accordingly, Plaintiff's objections to these declarations should be overruled.

Next, in their Reply, Defendants submit certain specific objections to portions of Plaintiff's declaration (Ex. 1 to Plaintiff's Response). Specifically, Defendants contend that the following specific statements are speculative, conclusory and lack proper predicate/foundation, and/or involve events during the incident that took place outside the presence of Plaintiff, therefore meaning he could not have had personal knowledge of them:

¶ 1:    "she is not, nor has she ever been, a danger or threat to society." (Objection is based on Plaintiff's admission that he was not present during the entire confrontation by Mrs. Seyfried against the officers.)

¶ 3:    "The object would not have been sharp enough to pierce skin." (Referring to the 4-5" metal letter opener. Objection is based on lack of predicate or foundation, speculative and conclusory.)

¶ 6:    "While it appeared to me that Delores was trying to run to our neighbor's house." (Objection is that the statement on its face lacks a predicate or foundation, is speculative and conclusory.)

¶ 7:    "[S]he was merely trying to get away." And "[s]he was trying to get away from Reed." (Objection based on lack of predicate or foundation, speculative and conclusory.)

¶ 14:   "The officers were never in danger of bodily injury." (Objection based on Plaintiff's admission he did not witness the entire confrontation; lack of predicate or foundation, speculative and conclusory; and that "Plaintiff impermissibly seeks to take his knowledge and position and impute that into police officers walking into a hectic scene.")

Reply at 17-18. Defendants are more specific in their objections than Plaintiff, and have offered particularized passages of Plaintiff's declaration. The Court takes the first statement as a generalized belief of Plaintiff based on his familiarity with Mrs. Seyfried, although the Court does not consider it with regard to the specific events of the incident of May 29, 2013. As to the second

statement, the Court finds it conclusory absent Plaintiff's explanation or basis for his statement. The remaining statements are speculative. However, the Court will simply recommend that Defendants' objections be overruled as moot on the basis that the Court will not take these specific statements into consideration in making its findings in this case. *Johnson v. Spohn*, 334 F. App'x 673, 678 (5th Cir. 2009) (per curiam).

Accordingly, Plaintiff's and Defendants' objections should be overruled for the respective reasons stated above.

## IV.     ANALYSIS AND DISCUSSION – MERITS

As noted above, Plaintiff asserts two claims against Defendants: excessive use of force against Mrs. Seyfried and a warrantless search of the couples' home, both in violation of the Fourth Amendment. As Defendants contend, Plaintiff has pleaded these two claims in blanket format against all Defendants, without specifically naming precisely which Defendants are the focus of each claim. However, the allegations of the complaint make clear against whom each claim could apply, as the Court discusses below.

Defendants assert that no constitutional violations occurred and seek either dismissal on the deficiency of the pleadings or summary judgment based on the competent summary judgment evidence they have submitted, including documentary evidence and Declarations by each of the officers involved in the response to the DAA's 911 call as well as that of Chief of Police William R. Kerbow. In the alternative, Defendants also rely on their asserted defense of qualified immunity. The defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known. *Harlow v. Fitzgerald*,

457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); *Wilson v. Layne*, 526 U.S. 603, 614, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999). The doctrine of qualified immunity shields government officials "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Fraire v. Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992), *citing Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). The Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims in *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). The Supreme Court held that courts are initially required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Id*. at 201. Second, if the Plaintiff has satisfied the first step, the court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id*. With respect to the second step, the Fifth Circuit has held that "a state actor is entitled to qualified immunity if his or her conduct was objectively reasonable in light of the legal rules that were clearly established at the time of his or her actions." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002), *cert. denied*, 537 U.S. 1232, 123 S. Ct. 1355, 155 L. Ed. 2d 196 (2003).

More recently in *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009), the Court held that "experience supports our present determination that a mandatory, two-step rule for resolving all qualified immunity claims should not be retained." *Id*. at 234. The Court went on to hold that "while the sequence set forth in [*Saucier*] is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of

appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

The Court will examine each claim in order.

## A.    Excessive Use Of Force

Plaintiff asserts that Defendants – or certain of them – improperly employed an excessive use of force in violation of the Fourth Amendment when they seized Mrs. Seyfried.   The United States Court of Appeals for the Fifth Circuit has stated,

> To bring a § 1983 excessive force claim under the Fourth Amendment, a plaintiff must first show that she was seized.   *See Graham v. Connor,* 490 U.S. 386, 388, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).   Next she must show that she suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable. *Goodson v. City of Corpus Christi,* 202 F.3d 730, 740 (5th Cir. 2000).

*Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004); *see also Davila v. United States*, 713 F.3d 248, 259 (5th Cir. 2013) (citing *Flores*); *Schmidt v. Gray*, 399 F. App'x 925, 928 & n.12 (5th Cir. 2010) (per curiam) (citing *Flores*); *Johnson v. Waters*, 317 F. Supp. 2d 726, 734 (E.D. Tex. 2004).   "'To gauge the objective reasonableness of the force used by a law enforcement officer, we must balance the amount of force used against the need for force,' paying 'careful attention to the facts and circumstances of each particular case.'"   *Ramirez v. Knoulton*, 542 F.3d 124, 128-29 (5th Cir. 2008) (quoting *Flores*, 381 F.3d at 399).   "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."   *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).   The determination is made objectively in light of the facts and circumstances confronting the officers without regard to their underlying intent or motivation.

18

*Graham*, 490 U.S. at 397.   Further,

> An officer seizes a person when he, "by means of physical force *or* show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) (emphasis added).   In addition, the "governmental termination of freedom of movement" must be made *"through means intentionally applied."*   *Brower v. County of Inyo,* 489 U.S. 593, 596–97, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989) (emphasis in original).

*Flores*, 381 F.3d at 396.   Here, there is little doubt that Mrs. Seyfried was seized by Officer Reed and Sergeant Letalien by their use of physical force, including hands-on restraint, use of the less lethal shotgun and employment of their Tasers.[11]   *Id.* (seizure by physical force when officer shot plaintiff's car, terminating her freedom of movement).   It is the nature and degree of that physical force that fuels Plaintiff's claim of excessive use of force in this case.   In Count One of Plaintiff's two causes of action, Plaintiff alleges in pertinent part that:

28. By their actions described herein, Defendants have violated 42 U.S.C. § 1983 and the constitutional provisions cited herein.[12]   Specifically, Defendants used excessive force in violation of Plaintiff's civil and constitutional rights as enumerated, and that such force was unreasonable under the circumstances.   Defendants were aware that the force used was grossly unnecessary.   No reasonable officer could have believed that such force was warranted in those circumstances.

29. Defendants' use of force was excessive and amounted to evil motive and/or intentional conduct.

30. At all times relevant hereto, Defendants Letalien, Reed, Moore, Cassels, Coyle and Powell as police officers of the City of Lewisville, were acting under the direction and control of the City of Lewisville which acted through its agents and employees who were responsible for making policy of the police department, its officers and operations, and Defendants Letalien, Reed, Moore, Cassels, Coyle and Powell were acting pursuant to either official policy or the practice, custom, and usage of the City of

---

[11] Referred to at times in various declarations as having "detained" Mrs. Seyfried.   However, it appears that she was never arrested.

[12] The Fourth Amendment.

Lewisville and its police department.

31. Acting under color of law, by and through the policy makers of the City and pursuant to official policy or custom or practice, the City of Lewisville intentionally, knowingly, recklessly, or with deliberate indifference to the rights of the inhabitants of the City of Lewisville, failed to instruct, supervise, control and/or discipline, on an [*sic*] continuing basis, Defendants Letalien, Reed, Moore, Cassels, Coyle and Powell in the performance of their duties to refrain from:

    a. Conspiring to violate the rights, privileges, and immunities guaranteed to Plaintiffs by the Constitution and Laws of the United States and the Laws of the State of Texas; and

    b. Otherwise depriving citizens of their constitutional and statutory rights, privileges, and immunities.

FAC at 8-9. On the other hand, despite Plaintiff's shotgun-style pleading against all Defendants named in this case, there is no basis for claiming the employment of excessive use of force by any other Defendant than Officer Reed and Sergeant Letalien. As will be seen, even the only other officer who was present for any portion of the confrontation with Mrs. Seyfried, Lieutenant Moore, neither participated in the use of force nor acted in a supervisory role; instead, his attention was focused on attempting to control and question Plaintiff. Moreover, Plaintiff tacitly acknowledges these facts in his recitation of Factual Background (Response at 2) and his headline argument that "Officers Reed, Letalien and Moore Used Extreme Force" (*id*. at 17), which focus only on the force allegedly used by Officer Reed and Sergeant Letalien while fundamentally alleging only that Lieutenant Moore "looked on." *Id*. at 19. Additionally, Plaintiff argues in a contradictory fashion that these Defendants allegedly used excessive force "pursuant to either official policy or the practice, custom, and usage of the City of Lewisville and its police department," FAC at 8 and *supra*, but then argues extensively in his Response that the same officers acted *in violation* of City policies. *See*, *e.g.*, Plaintiff's argument entitled "Officers

Repeatedly Violated the City of Lewisville's Policies," beginning at Response at 21.

## 1. The 911 Call

There is no dispute that Plaintiff had contacted the National Alzheimer's Association seeking assistance in handling Mrs. Seyfried either the night before or early the morning of May 29, 2013, and left a voice message that the national association relayed to the DAA at some point that day. Further, that the DAA and Plaintiff were engaged in a telephone call during which Plaintiff told the DAA employee about Mrs. Seyfried's demeanor and conduct and sought some type of assistance in handling her. During that call, the DAA, via another employee, Lindsay Regen, initiated a 911 call to the Lewisville Police Department during which she requested a "welness check" on the Seyfried residence.[13] The call lasted approximately 14:15 minutes, from the time of origination until Ms. Regen advised the 911 dispatcher, Meredith, that officers had arrived at the home. During that 911 call, Ms. Regen communicated a number of things to the Lewisville Police Department dispatcher, including that Plaintiff was Mrs. Seyfried's husband and primary caregiver; that Mrs. Seyfried suffered from Alzheimer's[14] and dementia; that she was agitated with her husband, had hit him several times with her fist, and had a letter opener in her hand; that she had a history of violence against her husband in the past; that Plaintiff was angry and intoxicated, having been drinking apparently for some time and that he had been drunk when he called the National Alzheimer's Association the night before; that Plaintiff kept a gun in the house

---

[13] All references to the 911 call are based on the Court's review of MTD/MSJ Exhibit 1, an audio CD containing the entire conversation. The Court will omit specific time references to the conversation, although it commenced at 2:00 p.m. on May 29, 2013.

[14] Ms. Regen originally stated that Mrs. Seyfried had both Alzheimer's and dementia, but later amended her statement because her call notes did not explicitly state that Mrs. Seyfried had Alzheimer's. It did say she had dementia and was on medication for it. However, based on Plaintiff's pleadings herein, there is no dispute that she has Alzheimer's.

because of his wife's paranoia, but that the bullets were not in the gun and were locked up separately; she provided dispatch with Plaintiff's and Mrs. Seyfried's names and ages; that Mrs. Seyfried was asking Plaintiff to leave; that the DAA intended to make a report to the Adult Protective Services, because Ms. Regen did not think Plaintiff could care for Mrs. Seyfried, and Ms. Regen requested a call back after the wellness check and to know whether responding officers would call Adult Protective Services; that Plaintiff had been drinking since the DAA's first contact with him earlier in the day; that Mrs. Seyfried had threatened to kill Plaintiff; that the DAA had told Plaintiff to leave the house; that Mrs. Seyfried had stabbed Plaintiff in the arm; and that Plaintiff had told the DAA that "if she kills him, he'll be happy" and statements to that effect. MTD/MSJ Ex. 1. The dispatcher made a call for paramedics to respond as well as police when she heard that Mrs. Seyfried had stabbed Plaintiff and advised Ms. Regen that police would respond first for the paramedics' safety. *Id*. Ms. Regen advised the dispatcher at approximately 13:45 into the call that Plaintiff had told the DAA that police had arrived and the call ended at about 14:15, though the line remained open for several seconds after that with only the dispatcher's office heard in the background. *Id*.

Plaintiff disputes some of these statements in his Response and supporting Declaration, as discussed below, although there is no dispute that Mrs. Seyfried was agitated and angry and holding a metal letter opener. Regardless of Plaintiff's disagreement, it is equally undisputed that Ms. Regen of the DAA made these statements to the Lewisville Police Department dispatcher during the 911 call (confirmed by the taped recording of the 911 call ) and that most of them were relayed to the responding officers. *See*, *e.g.*, MTD/MSJ Ex. 2 (CAD Operations Report of communications). Accordingly, the statements serve as indicators of the preparations

the officers would make and their expectations upon arrival at the Seyfried home.

## 2. Declaration and Documentary Evidence

A review of the declaration evidence adduced in support of and in opposition to summary judgment reveals that Officer Reed and Sergeant Letalien each responded separately to the radio dispatch regarding the situation at the Seyfried home. Officer Reed heard the dispatch request for two units, which also advised the call involved a person with Alzheimer's who had a letter opener and was upset and that a male was present who was intoxicated. Reed Decl. at 2, ¶ 4. As he proceeded, dispatch advised of reports that Mrs. Seyfried had stabbed someone and that someone "did not care if he/she dies." *Id*., ¶ 6. The call notes he received in his patrol car showed that the female on scene had threatened to kill the male on scene. *Id*. He was concerned and suspected a domestic disturbance involving someone being stabbed. *Id*. Sergeant Letalien also copied the dispatch call and computer notes that it involved a female with Alzheimer's, who was upset and threatening a male with a metal letter opener; that there was a gun inside the house; that the female had a history of physical violence; that she was threatening to kill someone; that the male was intoxicated; and that the female had stabbed someone. Letalien Decl. at 2, ¶ 5. She was the first officer to arrive at the scene. *Id*., ¶ 6. Officer Reed heard that Sergeant Letalien had arrived at the scene. Reed Decl. at 2, ¶ 7. As he proceeded, the two discussed their response preparations based on the information they had received and they decided that she would have a less lethal shotgun and he would have a Taser. *Id*. at 2-3, ¶ 7; Letalien Decl. at 3, ¶ 7.

At the scene, Officer Reed and Sergeant Letalien attempted contact at the front door, but there was no answer. Reed Decl. at 3, ¶ 8; Letalien Decl. at 3, ¶. Officer Reed went to the back of the house while Sergeant Letalien held a position in the front yard. *Id*. Officer Reed found

Plaintiff at the back gate, talking on the phone and trying to jam his car keys into the locking mechanism of the gate, trying to keep it from being opened. Reed Decl. at 3, ¶ 9. Plaintiff initially asked for help because Mrs. Seyfried was "going crazy." *Id.* Officer Reed asked if he was injured and Plaintiff showed him a "fresh, bleeding cut on his arm," which he said he had received while he was "trying to wrestle the letter opener away from [Mrs. Seyfried]." *Id.*, ¶ 10. Plaintiff then turned angry and hostile and Officer Reed directed him to move to the front yard for safety. *Id.*, ¶ 11. Officer Reed escorted him to Sergeant Letalien's position. *Id.*; Letalien Decl. at 3, ¶ 9. When Plaintiff saw Sergeant Letalien's less lethal shotgun, he became incensed. Reed Decl. at 3, ¶ 11; Letalien Decl. at 4, ¶ 10. He started screaming, "What the F... is that?" "F... you! That is NOT necessary! No, no, no!!! F... you!!!" at Sergeant Letalien. Letalien Decl. at 4, ¶ 10. At that point, Sergeant Letalien asked Lieutenant Moore, who she understood was responding to the scene, to "step it up"[15] because Plaintiff was losing control. *Id.* Lieutenant Moore received the request and responded he was not far from the scene. Moore Decl. at 2, ¶ 6.

Officer Reed returned to the back gate and noticed that the back door of the house was open, about six to seven feet from the gate. Reed Decl. at 4, ¶ 12. He cracked the gate open and yelled, "Police Officer; come out!" *Id.* Mrs. Seyfried walked urgently out the back door, holding a metal, dagger-like letter opener in her right hand with a tight grip. *Id.*, ¶ 13. In her left hand, she held a large padlock, which Officer Reed believed had been taken from the gate. *Id.* She was enraged, slobbering and gritting her teeth. *Id.* at 14. She saw Officer Reed and yelled, "I will f...ing kill you" and advanced toward him with the letter opener pointing at him as if she was going to stab him. *Id.* Officer Reed ordered her to drop the weapon, but she ignored him; he

---

[15] Meaning to speed up his response to the scene.

tried to close the back gate, but he was not able to keep her inside and she was able to open it and come through. *Id*., ¶ 15. Officer Reed became concerned for his own safety. *Id*. at 5, ¶ 15. He retreated, still ordering Mrs. Seyfried to drop the weapon. *Id*., ¶ 16. He backed into a car and Mrs. Seyfried approached within arm's reach. *Id*. He grabbed her right hand – holding the letter opener – with his left hand, but Mrs. Seyfried began beating his wrist with the padlock in her left hand. *Id*. Officer Reed drew his Taser and discharged it at her torso; however, only one prong made contact with her and the Taser did not deliver a charge to her. *Id*., ¶ 17. Instead, it gave off an audible alarm that it had not discharged. *Id*. Officer Reed then attempted to use the drive-stun feature directly on Mrs. Seyfried, but she backed away and Officer Reed took the opportunity to back away and reload the Taser. *Id*. at 6, ¶ 18.

Sergeant Letalien heard the audible alarm and ran to the back of the house. *Id*., ¶ 19; Letalien Decl. at 4, ¶ 12. Plaintiff followed to the back of the house. Letalien Decl. at 5, ¶ 16. Mrs. Seyfried again began advancing on Officer Reed, holding the metal letter opener with the blade toward Officer Reed in a threatening manner. Reed Decl. at 6, ¶ 19; Letalien Decl. at 5, ¶ 13. Both officers shouted at Mrs. Seyfried to drop the letter opener, but she ignored them. Reed Decl. at 6, ¶ 19; Letalien Decl. at 5, ¶ 14. Believing a threat of imminent harm existed, Sergeant Letalien fired the less lethal shotgun, hitting Mrs. Seyfried's left thigh with a bean bag round. Letalien Decl. at 5, ¶ 15; Reed Decl. at 6, ¶ 20. However, she did not fall or stumble and appeared unfazed. Letalien Decl. at 5, ¶ 15; Reed Decl. at 6, ¶ 21. Lieutenant Moore, who had arrived and exited his car, heard the distinctive sound of the less lethal shotgun, which he recognized, and went to the back of the house. Moore Decl. at 2-3, ¶ 7. He saw Mrs. Seyfried holding "a metal dagger-like object in her hand" with a furious look on her face, slobbering, clenching her teeth and

white-knuckled.  *Id*. at 3, ¶ 8.

Mrs. Seyfried saw her husband, Plaintiff, and became even more enraged and started yelling and cursing.  Letalien Decl. at 5, ¶16; Reed Decl. at 7, ¶ 22; Moore Decl. at 3, ¶ 9.  He was generally behind Sergeant Letalien.  Letalien Decl. at 5, ¶ 16; Reed Decl. at 7, ¶ 23.  The officers continued to yell at Mrs. Seyfried to drop the weapon, but she continued to ignore them. *Id*.  She started moving toward her husband, and toward Sergeant Letalien, holding the letter opener in a threatening manner.  *Id*.  Sergeant Letalien, believing a threat of imminent harm existed to her and to Plaintiff, fired a second bean bag round from the less lethal shotgun, hitting Mrs. Seyfried in the other thigh.  Letalien Decl. at 6, ¶ 16; Reed Decl. at 7, ¶ 23; Moore Decl. at 3-4, ¶ 10.  She was again almost unaffected, but went to one knee, yelled, "You Bitch," and got back up again.  Letalien Decl. at 6, ¶ 17; Reed Decl. at 7, ¶ 24; Moore Decl. at 4, ¶ 10.  Plaintiff was also yelling and enraged.  Reed Decl. at 7, ¶ 25.

Sergeant Letalien asked Lieutenant Moore to remove Plaintiff from the driveway.  Moore Decl. at 4, ¶ 12.  He turned to talk to Plaintiff and to remove him, hoping to deescalate the situation.  *Id*.

Mrs. Seyfried suddenly turned toward the back yard.  Letalien Decl. at 6, ¶ 18; Reed Decl. at 7, ¶ 26.  Sergeant Letalien was concerned she would re-enter the house, where she would be on familiar territory and have the element of surprise, making the situation more dangerous.  Letalien Decl. at 6, ¶ 19.  She fired a third bean bag round from the less lethal shotgun and hit Mrs. Seyfried on the left buttock.  *Id*.; Reed Decl. at 7, ¶ 26.  The impact again had no effect on Mrs. Seyfried and Sergeant Letalien drew her Taser and fired, connecting to her back and causing her to fall to the ground.  Letalien Decl. at 7, ¶ 20; Reed Decl. at 8, ¶ 26.  Lieutenant Moore heard the

third bean bag shot and turned to see Mrs. Seyfried walking toward the gate when Sergeant Letalien fired the Taser. Moore Decl. at 4, ¶ 12.

Officer Reed moved to Mrs. Seyfried to remove the weapon and handcuff her, to find that her right hand was empty but her left hand and arm were curled under her body; he handcuffed her right hand but could not get her left arm out from underneath her and believed she had the letter opener in her left hand. Reed Decl. at 8, ¶ 27; Letalien Decl. at 7, ¶¶ 21-22. Lieutenant Moore continued to attempt to control Plaintiff. Moore Decl. at 4, ¶ 13. Mrs. Seyfried began fighting, kicking and otherwise resisting Officer Reed's attempt to get her left arm out and fully handcuff her. Reed Decl. at 8, ¶¶ 28-29; Letalien Decl. at 7, ¶ 23. Officer Reed could not get her left arm out with his single hand; therefore, he placed his right boot on her right hand to control it and used both hands to reach her left hand and the weapon, while Mrs. Seyfried continued to struggle against him. Reed Decl. at 8, ¶ 29. Sergeant Letalien reached in and gave Mrs. Seyfried a short drive stun with her Taser to the back of her left thigh. Letalien Decl. at 7, ¶ 23; Reed Decl. at 8, ¶ 30. Mrs. Seyfried eased her resistance with the stun, and Officer Reed was able to get her left arm out, remove the letter opener which was indeed in her left hand and finish handcuffing her. Reed. Dec. at 8-9, ¶ 30; Letalien Dec. at 8, ¶ 24. Officer Reed searched Mrs. Seyfried for other weapons, moved her to a seated position and removed the Taser probes from her body. Reed Decl. at 9, ¶ 31; Letalien Decl. at 8, ¶ 25. Sergeant Letalien called for the paramedics, who were staged nearby, to come and attend to Mrs. Seyfried. Letalien Decl. at 8, ¶ 25. Mrs. Seyfried continued to violently struggle against the handcuffs and kick and scream; Officer Reed questioned whether she would break the chain on the handcuffs. Reed Decl. at 9, ¶ 32.

After Mrs. Seyfried was handcuffed, Officer Chessa Cassels arrived at the scene. Cassels

Decl. at 2, ¶ 6.   She observed Plaintiff yelling and cursing at the officer on scene and went to assist Lieutenant Moore.   *Id*., ¶ 5.   As Mrs. Seyfried was loaded into the ambulance for transport to the hospital, paramedics requested an officer to accompany them due to her aggressive behavior.   *Id*., ¶ 8.   Therefore, Officer Cassels rode in the ambulance with Mrs. Seyfried, who remained handcuffed for her safety and the safety of others in the ambulance.   *Id*.   Upon arrival, nursing staff promptly attended her and Officer Cassels informed the staff that she was in handcuffs for the protection of others due to her combative conduct.   *Id*. at 3, ¶ 9.   The nursing staff spoke with Mrs. Seyfried, but was not able to obtain any answers from her and she did not have any recollection as to how she obtained her injuries or why.   *Id*. at ¶ 10.   The nursing staff then agreed that her handcuffs could be removed for treatment.   *Id*.   While Officer Cassels was doing so, Mrs. Seyfried said, "I'm gonna need a gun before I leave here."   *Id*.   Officer Cassels was concerned, but she confirmed that the nursing staff still wanted the handcuffs off, so she completed removing them.   *Id*.   She took photographs of Mrs. Seyfried's injuries with a digital camera pursuant to Lewisville Police Department policy, then left the hospital and returned to the Department.   *Id*. at ¶ 11.

Plaintiff, by his Declaration opposing summary judgment, generally agrees with the sequence of events but views the events with a different perspective and disagrees with some points.   He agrees that he had been talking with the DAA on May 29, 2013, about Mrs. Seyfried's agitation with him and that she had entered the room "with a dull four inch letter opener in her hand."   Seyfried Decl. at 2, ¶ 3.   The DAA told him to leave the house and let her cool off.   *Id*.   The DAA also contacted the Lewisville Police Department without his consent or telling him they were doing so.   *Id*.   He admits that "[a]t this point, I was at my wits end and tired of the drama

and being berated by her." *Id.* He asserts that he "had NOT been drinking and was assuredly not intoxicated." *Id.* Officer Reed arrived and Plaintiff was upset at their presence. *Id.*, ¶ 4. He asserts he remained calm. *Id.* He told Officer Reed that Mrs. Seyfried had Alzheimer's and that he could handle the situation. *Id.* Sergeant Letalien arrived. *Id.* He told the officers that nobody had been injured or needed medical attention but never told any officer that he had attempted to wrestle the letter opener away from Mrs. Seyfried. *Id.* He admits he had a scratch on his arm, but that "it was old." *Id.* He agrees that Officer Reed told him to go to the front of the house, though he again explained to Officer Reed about Mrs. Seyfried's Alzheimer's disease. *Id.*, ¶ 5. He found Sergeant Letalien with the "orange shotgun" and became concerned because he thought it was a "real shotgun" and that Mrs. Seyfried would be killed. *Id.* He heard Mrs. Seyfried scream, put his hands in the air and walked back towards her. *Id.* Sergeant Letalien followed him "and took a position where she could shoot me if I moved." *Id.* He does not state what led him to that conclusion.

He states he saw Officer Reed with a Taser and was chasing Mrs. Seyfried between the cars in the driveway. *Id.*, ¶ 6. Lieutenant Moore had arrived and was standing in the back of the house. *Id.* He observed Sergeant Letalien hit Mrs. Seyfried in the thigh with the shotgun and Plaintiff started shouting at the officers to stop. *Id.* Mrs. Seyfried did not fall and Sergeant Letalien again fired at her other thigh. *Id.* at 2-3, ¶ 6. The second shot knocked her down, but she got back up. *Id.* at 3, ¶ 6.

Plaintiff could not see what happened with the letter opener at that point because Mrs. Seyfried turned away and started to run toward the alley behind the house. *Id.*, ¶ 7. Plaintiff continued screaming and Lieutenant Moore told him to "shut up." *Id.* Plaintiff admits he "didn't

use nice words" but did not move. *Id*. Sergeant Letalien fired again, hitting her in the left buttocks and "busting the skin on her thigh." *Id*. Mrs. Seyfried again did not fall and Sergeant Letalien fired her Taser, hitting her with one probe in the back and the other on her right buttocks. *Id*. Mrs. Seyfried then fell. *Id*. Plaintiff asserts she was not near the back gate but had been trying to get away. *Id*.[16] Plaintiff believes Mrs. Seyfried cut her chin, broke a tooth and hit the front of her head in the fall. *Id*., ¶ 8. Her left arm was under her body and the officers continued to "scream at her." *Id*. Officer Reed then handcuffed her right hand and stepped on her right wrist with his boot; Sergeant Letalien then Tasered Mrs. Seyfried again "because she allegedly wasn't following their directions being shouted." *Id*., ¶ 9. She was then fully handcuffed. *Id*. The officers then turned Mrs. Seyfried over and sat her "on her bottom" while the ambulance came; Officer Reed removed the probes from Mrs. Seyfried. *Id*., ¶ 10. She was loaded into an ambulance, but Plaintiff states he was not told where she was being taken until later. *Id*.

### 3. Analysis

Although Plaintiff argues opposite to Defendants on the issue of the necessity or reasonableness of the force used, once the emotional overtone of his Declaration is passed, there is remarkably little difference in the sequence of events and actions of the individuals at the scene between his rendition and the Defendants'.

Nonetheless, Plaintiff contends that the Defendants (not specifying which ones, though even his own Declaration makes clear that no officer participated in the use of force other than

---

[16] He provided an Internet link to a Google map purporting to show his house as a means of explaining the orientation of the events. *Id*. The link does not open that view, but Plaintiff attached a copy of the overhead view to his Response as Exhibit 6. *Id*. The overhead view, however, is not useful at the scale provided.

Officer Reed and Sergeant Letalien) violated Mrs. Seyfried's Fourth Amendment rights though an excessive use of force when seizing her. Specifically, he contends that the officers, knowing in advance that she was an Alzheimer's sufferer with dementia and advanced in age, acted unreasonably in planning their response to include the use of the less lethal shotgun and Taser, instead of something less forceful. He explicitly asserts that they should have used pepper spray instead. Response at 6, 18, 23. He contends that the use of the Tasers violated Lewisville Police Department policy. *Id*. at 21-22 (citing MTD/MSJ Ex. 11, General Order 4.55, entitled "TASER"). He asserts that at age 67, Mrs. Seyfried falls into the extreme age category that is generally (but not absolutely) excluded under that General Order. He also contends that Officer Reed's use of his foot to pin Mrs. Seyfried's hand down while freeing his hand to grapple with her left arm was unreasonable. Response at 20. Additionally, he asserts that Officer Reed, Sergeant Letalien, Lieutenant Moore and Officer Cassels all violated city policy on dealing with the mentally ill, citing Exhibit 4 to his Response (Lewisville Police Department General Order 4.6, entitled "DEALING WITH THE MENTALLY ILL"). Finally, he asserts that Officer Reed also violated policy when he removed the Taser probes from Mrs. Seyfried with his hands, asserting that it was unsanitary. Response at 6, 22.

Plaintiff's argument is a classic case of an attempt to impose 20/20 hindsight on the officers' actions. *Graham*, 490 U.S. at 396. The responding officers had only the reports from the dispatcher upon which to base their planned response. It is true that the dispatch advisory included that Mrs. Seyfried was an Alzheimer's patient and suffered from dementia, but that does not mean that she could not pose a threat. Indeed, it easily means that the patient could respond with force and violence. The officers were aware that she was armed with a letter opener and had

hit her husband several times with her fist and had stabbed him; that she was agitated and angry; that Plaintiff was also angry and was intoxicated as well. They knew Mrs. Seyfried had a history of violence against her husband and on this specific occasion had threatened to kill him, leading the DAA to advise him to leave the house, which he had done. They also knew that there was a gun in the house, even if it was reportedly unloaded and locked up.

Plaintiff faults Officer Reed and Sergeant Letalien for planning a response with a Taser and a less lethal shotgun, pointing specifically at the Lewisville Police Department policies on Tasers and on the use of pepper spray.

Regarding the Taser policy, General Order 4.55 states in pertinent part that "The TASER is not intended to be used on individuals who are handcuffed *except when faced with continued violent resistance*" and "Unless there are *compelling reasons that can be clearly articulated involving the threat of great bodily harm or death*, the TASER shall not be used when the subject is at the extreme of age, young or old or is physically disabled." MTD/MSJ Ex. 11 at 2-3 (Def. MSJ App. P. 58-59) (emphasis added). The Court notes that the officers did not use a Taser on Mrs. Seyfried when she was handcuffed, with the exception that one direct drive stun was applied while Officer Reed was grappling with her and only one wrist had a handcuff bracelet on it. Otherwise, she was offering "continued violent resistance" to his efforts to fully handcuff her and get her left arm and hand (holding the metal letter opener) out from underneath her body. The Court finds no policy violation in that instance.[17]

_____

[17] Plaintiff also briefly contends that Officer Reed violated the Taser policy by removing the Taser probes from Mrs. Seyfried with his bare hands. It is true that the policy states that "The following steps should be used if an officer is removing probes in the field or jail[. . .] The officer shall remove the cartridge from the Taser and put on medical latex gloves" and "then clean the impact

32

In terms of the officer's preliminary preparations, they may have known that Mrs. Seyfried was 67 or 68, by different reports, but that does not necessarily reflect someone of "extreme age" nor does the policy itself set specific age parameters. She certainly was not physically disabled, but was able to force her way out the back gate of the house, grapple with and resist Officer Reed, take aggressive stances and move quickly from the back door of the house across the yard and into the driveway, including advancing in a threatening manner first on Officer Reed and then on Plaintiff and Sergeant Letalien. More to the point, both officers articulated the threat of great bodily harm when they discussed their preparations and certainly in their Declarations. At the very least, Mrs. Seyfried was armed with a dagger-like metal letter opener, had threatened to kill her husband, and advanced on both officers and Plaintiff at different times during the confrontation. Again, the Court finds no violation of policy in their decision to prepare themselves with these choices of less-than-lethal weapons. In fact, given the real danger of bodily harm or death, even preparation for the use of deadly force would not be unreasonable. *Ontiveros v. City of Rosenberg, Texas*, 564 F.3d 179, 383 (5th Cir. 2009) (citing *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003)).

Plaintiff also contends that the officers should have used pepper spray instead of the less lethal shotgun and Tasers, and refers to Exhibit 5 of his Response, the Lewisville Police Department General Order 4.52, entitled "OLEORESIN CAPSICUM (OC) AEROSOL

---

sites with an alcohol wipe and allow the skin to dry before placing band-aids over the impact sites." MTD/MSJ Ex. 11 at 3-4. Possibly Officer Reed committed a technical violation of the policy by not doing so. However, his removal of the probe occurred after the use of force was complete and could not have contributed to any alleged "excessive use of force"; and, paramedics were ready to attend to Mrs. Seyfried in other medical regard. The Court finds this particular allegation to be immaterial to the excessive use of force claim.

RESTRAINT SPRAY." However, there is nothing in either that policy, the Taser policy, nor the Department's Use of Force policy (Lewisville Police Department General Order 4.1, Exhibit 10 to the MTD/MSJ) requiring the use of one over another in any particular circumstance. Indeed, the pepper spray policy does expressly state that in order to use pepper spray effectively, "[a]n officer should maintain a safe distance from the suspect of between three and 10 feet" and "avoid entering the spray area." Response Ex. 5 at 2. As is easily seen from the Declarations of all three officers and Plaintiff, that was not possible with Mrs. Seyfried actively involved in advancing on them and the necessity to grapple with her. Moreover, the officers' selection of weapons could only be based on what they understood the situation to be and cannot be second-guessed from the safety and quiet of an office long after the fact. *Graham*, 490 U.S. at 396.

Regarding the Lewisville Police Department's General Order 4.6, entitled "DEALING WITH THE MENTALLY ILL" (Exhibit 4 to Plaintiff's Response), it does counsel officers to attempt to approach the mentally ill in a "low profile manner" and to adopt an appropriate communications posture where appropriate. However, the entire policy, similar to the other policies discussed above, is first premised on the necessity to "assess the intent of capabilities of that individual and take reasonable action to ensure the safety of everyone involved in a particular situation." *Id*. at 1. Employee responsibilities first include, "If a crime has been committed take appropriate enforcement action" and "Absent a crime, evaluate an individual's behavior in the total context of the situation in determining the need for police intervention." *Id*. Further, "The role of LPD personnel is to resolve a particular situation as safely as possible through an arrest or referral to appropriate medical or mental health services." *Id*. Accordingly, police officer dealings with the mentally ill, including Alzheimer's patients, first have the responsibility to react

to a crime being committed and to ensure their own safety and the safety of others. That is precisely what Officer Reed and Sergeant Letalien did here; the Court finds no violation of the Department's policy.

In terms of their actual reaction during the confrontation, the Court also finds that the officer acted reasonably under the totality of the circumstances. At the initial encounter, when Officer Reed, who was by himself, called to the house for anyone inside to come out, Mrs. Seyfried immediately and urgently exited the back door looking enraged, gritting her teeth, and holding the dagger-like letter opener in a threatening manner. Seeing Officer Reed, she exclaimed, "I will f...ing kill you!" and advanced toward his location at the back gate. Officer Reed tried to block the gate shut, but Mrs. Seyfried pushed through it and advanced on the retreating Officer Reed, whose retreat was ultimately blocked by a parked car. Mrs. Seyfried caught up to him, brandishing the metal letter opener at him. Officer Reed responded by grabbing her right hand – holding the letter opener – with his left hand and when Mrs. Seyfried beat his left wrist with the large padlock in her left hand, he attempted to deploy his Taser at her, but the probes did not seat properly, causing the Taser to emit the alarm sound that alerted Sergeant Letalien. Before Officer Reed could use his Taser in drive-stun mode, Mrs. Seyfried backed away.

Sergeant Letalien responded to the sound of the Taser and approached the driveway/back yard position, to find Mrs. Seyfried brandishing the weapon in a tight grip and advancing on Officer Reed with an angry look on her face. Plaintiff also approached the position, continuing his commentary to the officers consisting of, in his own words, "not very nice words," and adding to the tension and confusion of the situation. Perceiving a threat to Officer Reed, Sergeant Letalien fired the first bean bag round from the less lethal shotgun, hitting Mrs. Seyfried in one

thigh, but without affecting her other than eliciting an exclamation.   Mrs. Seyfried continued to advance on Officer Reed until she saw her husband, Plaintiff, at the driveway location.   She then shifted her focus on him, cursing and shouting in anger at him.   Plaintiff was generally behind Sergeant Letalien and when Mrs. Seyfried started advancing with the letter opener toward Plaintiff, she was also advancing on Sergeant Letalien.   Sergeant Letalien perceived a developing threat toward both Plaintiff and her, and fired a second bean bag round from the less lethal shotgun, hitting Mrs. Seyfried in her other thigh, causing her to briefly go to one knee, but then shouting, "You Bitch!," she got back up and continued to brandish the weapon in a threatening manner.   Both officers shouted commands at Mrs. Seyfried to drop the weapon, but she ignored them.   She then suddenly turned toward the back yard, and generally in the direction of the house. Plaintiff contends she was simply trying to get away.   In either case, Sergeant Letalien perceived a potential threat in Mrs. Seyfried returning to the house – either to anybody inside the house or in allowing Mrs. Seyfried refuge and the element of surprise on familiar territory – or in escaping while still armed.   She fired her third and final bean bag round from the less lethal shotgun and hit Mrs. Seyfried in the buttock, but again without result as Mrs. Seyfried kept her feet and continued. Sergeant Letalien then deployed her Taser and fired it at Mrs. Seyfried, completing a circuit connection and bringing her down.   All of these actions showed restraint on the parts of both officers when faced with a potentially dangerous weapon and a situation that was escalating by Mrs. Seyfried's continued aggressive actions.

Lieutenant Moore, in the meantime, had arrived at the scene but was not involved in the use of force; instead, he was trying to control and talk to Plaintiff and obtain answers from him about the situation, but Plaintiff refused to cooperate.   While Plaintiff attempts to paint a somewhat

different picture in his Declaration, he never addresses whether he even attempted to cooperate with Lieutenant Moore but does repeat a number of times that he continued to yell and cry and "didn't use nice words" in doing so.

Officer Reed then proceeded to attempt to handcuff the combative Mrs. Seyfried and found that she no longer had the letter opener in her right hand, which he did handcuff. He tried but could not get her left arm out from underneath her and believed she had the letter opener in that hand. To obtain the use of both hands, he held her right wrist down with his foot and used both hands to try to pull her arm out. Mrs. Seyfried continued to fight and kick. Sergeant Letalien then used a drive-stun to the back of one of her legs long enough for Officer Reed to get the left arm out, remove the letter opener from her left hand, and complete handcuffing her. The use of force ended then, although Mrs. Seyfried violently tried to get her hands free from the handcuffs.[18] The timeline contained in Exhibit 2 to the MTD/MSJ reflects that the entire confrontation, from the first encounter with Mrs. Seyfried until she was handcuffed, took approximately three minutes. The officers sat her upright and Officer Reed removed the Taser probes from her as paramedics were called to approach from their staging point.

Mrs. Seyfried received a cut on her chin, which required stitches; a broken tooth (which

---

[18] In his Response, Plaintiff argues that when Mrs. Seyfried went down to one knee, it would have been appropriate for Officer Reed, Sergeant Letalien and Lieutenant Moore to handcuff her then. He ignores the consistent statements by all of them that Mrs. Seyfried got up immediately and continued to brandish the letter opener she used as a weapon and further ignores Lieutenant Moore's statement that he was trying to control and talk to Plaintiff during this time. Instead, Plaintiff argues sarcastically that "Officers Reed and Letalien state that this woman was almost superhuman and could sustain force and injury like no other." Response at 19. The Court finds no such statements in any of the officers' Declarations. Instead, they reported a determined, violent and unresponsive woman who surprised them by absorbing three bean bag rounds from Sergeant Letalien's less lethal shotgun and who was enraged and refused to drop her weapon.

Plaintiff later referred to as a denture); a wound to a thigh from one of the bean bag rounds that required staples to close; various bruises and contusions from the confrontation; and had been shocked twice by Taser. She also had a broken right wrist, which Plaintiff repeatedly ascribes to Officer Reed "crushing" her wrist with his boot, although no report, including his own Declaration, supports any such finding. Moreover, the medical reports of Mrs. Seyfried's condition submitted by the Parties do not identify the source of her broken wrist.

In any event, there is no question that Mrs. Seyfried suffered injury. "The relevant question in this case is whether the force was 'clearly excessive' or 'clearly unreasonable.'" *Ramirez*, 542 F.3d at 128. In making that determination, the Court must consider "whether 'the totality of the circumstances justified' the particular use of force." *Id*. (quoting *Tennessee v. Garner*, 471 U.S. 1, 9, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)). Although Plaintiff attempts to ascribe a bad intent or evil motive to the officers in his pleadings, reasonableness must be determined using the perspective of a reasonable officer on the scene, and is an objective standard, without regard to the officers' underlying intent or motivation. *Id*. at 128-29 (citations omitted). Here, as related in detail above and in the officers' Declarations, Mrs. Seyfried was armed with a dagger-like metal letter opener that she brandished in a tightly-held grip while, at different times, advancing threateningly on the officers and on Plaintiff while pointing the weapon at them. She made a threat that "I will f...king kill you" to Officer Reed and continued with an enraged attitude and look on her face while gritting her teeth and cursing. It is entirely reasonable that the officers viewed her as an imminent threat to theirs and Plaintiff's safety. Furthermore, the officers had been informed that she had threatened to kill Plaintiff, had a history of violence against him in the past, and that she had stabbed Plaintiff (who displayed a fresh, bleeding scratch on his arm). They

prepared themselves with weapons avoiding an actual application of deadly force with the Tasers and a less lethal shotgun with bean bag rounds.   Such weapons are designed to stop and subdue a suspect, typically short of employing deadly force.   Plaintiff contends that the officers should have gone farther and limited themselves to pepper spray.   However, that is neither reasonable under the circumstances, based on the knowledge the officers had when they encountered Mrs. Seyfried, and it amounts to no more than 20/20 hindsight.   *Graham*, 490 U.S. at 396; *Ramirez*, 542 F.3d at 129.   Plaintiff also contends, repeatedly, that by the time he spoke initially with Officer Reed, before the officer encountered Mrs. Seyfried, that he had told Officer Reed that Mrs. Seyfried had not stabbed anyone and that the scratch on his arm was "superficial."   He would impute that information as hard and fast truth on all of the other officers.   Even if true, that is not material.   The officers prepared themselves on what was known prior to their arrival. Furthermore, from the outset, Mrs. Seyfried's wielding of the weapon, her aggressiveness, her threats and active pattern of attack were the "totality of the circumstances" of the moment, not a statement by Plaintiff that was contradicted by Mrs. Seyfried's actions almost immediately.

The officers' continued actions were reasonable based on Mrs. Seyfried's continued threats, brandishing of the weapon and her resistance to the officers and their attempts to subdue her.   Despite Plaintiff's sarcastic comment about his wife's apparent superhuman ability to resist those efforts, the fact is that she did so and essentially shrugged off three bean bag rounds and was only subdued after being hit with the Taser, and then Tased again when she continued to fight while on the ground.   Even Plaintiff's account via his Declaration does not dispute that Mrs. Seyfried was able to resist, including the less lethal shotgun rounds, and continue her fight.

In the totality of the circumstances, given the officers' knowledge and Mrs. Seyfried's

actions, Defendants acted with objective reasonableness.   Plaintiffs' own Declaration is consistent with Defendants' in all issues material to this analysis.   Although he differs in some assessments – such as whether he was intoxicated – he has presented no genuine issues of material fact.   *Anderson*, 477 U.S. at 247-48.   There was no Fourth Amendment violation and summary judgment should be granted to Defendants on the issue of excessive use of force.

**B.    Warrantless Protective Sweep**

In his second claim, Plaintiff asserts that Defendants performed a "wrongful search and seizure" of the couples' home.   In pertinent part, the FAC states:

> 35.    After Delores was taken to the hospital for the abuse caused by the City of Lewisville by and through its police officers, the City of Lewisville proceeded to search the home of the Seyfrieds for no reason and without probable cause to do so.

> 36.    The Fourth Amendment of the United States Constitution affords the citizens of this Country the right to be free from wrongful search and seizure.   The City of Lewisville deliberately violated the rights of the Seyfrieds by entering the home of the Plaintiffs without consent to do so and without probable cause to do so.

FAC at 9-10.   Aside from incorporating prior allegations, this is the entire claim contained in the FAC.

A warrantless entry into a home is presumptively unreasonable.   *Payton v. New York*, 445 U.S. 573, 587, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980).   However, exigent circumstances may exist to justify the intrusion.   *See Minnesota v. Olson,* 495 U.S. 91, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990); *Welsh v. Wisconsin,* 466 U.S. 740, 750, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984); *United States v. Rico*, 51 F.3d 495, 500–01 n. 6 (5th Cir.1995).   "As a general rule, exigent circumstances exist when there is a genuine risk that officers or innocent bystanders will be endangered, that suspects will escape, or that evidence will be destroyed if entry is delayed until a

warrant can be obtained." *United States v. Menchaca-Castruita*, 587 F.3d 283, 289 (5th Cir. 2009); *United States v. Albarado*, 555 F. App'x 353, 356 (5th Cir. 2014) (per curiam). Further, "[u]nder the exigent-circumstances exception, law-enforcement officers may enter a residence without a warrant if they have an 'objectively reasonable basis for believing that an occupant is . . . imminently threatened' with serious injury." *Velasquez v. Audirsch*, - - - F. App'x - - - -, 2014 WL 2978535, at *3 (5th Cir. July 3, 2014) (per curiam) (citing *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006)); *see also Thomas v. Texas Dept. of Family and Protective Servs.*, 427 F. App'x 309, 314 (5th Cir. 2011) (per curiam) ("the Supreme Court has held that 'law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury[,]'" citing *Brigham City*¸ 547 U.S. at 403). Although officers cannot deliberately create the exigent circumstances in order to avoid the Fourth Amendment, the United States Supreme Court has "rejected a rule that police may not rely on an exigency for a warrantless search if it was 'reasonably foreseeable' that their legally permissible tactics would create the exigent circumstances." *Albarado*, 555 F. App'x at 358 (citing *Kentucky v. King*, - - - U.S. - - - -, 131 S. Ct. 1849, 1859-60, 179 L. Ed. 2d 865 (2011)).

A police officer may make a protective sweep, including of a residence, following a seizure or an arrest. "The protective sweep doctrine allows government agents, without a warrant, to conduct a quick and limited search of premises for the safety of the agents and others present at the scene." *Albarado*, 555 F. App'x at 357 (citing *United States v. Gould*, 364 F.3d 578, 581 (5th Cir. 2004) (en banc), *abrogated in part on other grounds by King*, 131 S. Ct. 1849).

Here, Plaintiff contends that the Defendant City of Lewisville, through the Defendant

police officers at the scene, violated the Fourth Amendment by conducting a "wrongful search and seizure" of the house after Mrs. Seyfried had been subdued and was either being prepared for transport or had just been transported via ambulance to the hospital.[19]

The FAC does not distinguish which of the Defendant officers was involved in the protective sweep of the house, and in fact alleges that the Defendant City of Lewisville itself was the actor, but it was obviously through the participants on scene. However as documented below, review of the declarations attached to the MTD/MSJ pleadings reveals that Officer Reed and Officer Hayney conducted the protective sweep at the direction of Lieutenant Moore. Once Lieutenant Moore was done talking to Plaintiff, he also proceeded to the back door of the house with the intention of joining the protective sweep. Officer Coyle also began to join the protective sweep. However, as both of them entered the back door, they encountered Officer Reed and Officer Hayney on their way out, having completed the uneventful protective sweep, and all four

---

[19] The FAC simply states that this occurred, "After Delores was taken to the hospital . . . ," FAC at 9; none of the MTD/MSJ pleadings resolve the exact timeline. Lieutenant Moore, who was the decision maker directing that a protective sweep be performed, addressed both his observation of a portion of the seizure of Mrs. Seyfried and his decision to perform a protective search. Moore Decl. at 3-6, ¶¶ 9-18. He does not specify the exact moment he ordered the protective search with relation to Mrs. Seyfried's transport to the hospital, but taking his statements in context, his decision was made and executed at or immediately before or after the transport occurred. This is corroborated by Officer Reed's declaration; he performed the protective sweep with Officer Hayney after he subdued Mrs. Seyfried with Sergeant Letalien. He attested that after he subdued Mrs. Seyfried and removed the Taser probes from her, "Mrs. Seyfried continued to kick and scream. She wrenched her wrists so violently I seriously questioned whether she was going to break the chain on my handcuffs. The paramedics treated Mrs. Seyfried, and eventually took her to the hospital." Reed Decl. at 9, ¶ 33. He immediately added, "Shortly after I detained Mrs. Seyfried, Lieutenant Moore [ ] requested that Officer Hayney [ ] and I conduct a brief protective sweep of the home to determine if there was anyone inside who was injured." *Id*., ¶34. He then detailed the conduct of the protective sweep. Based on this recounting, the protective sweep was ordered and executed in very short order after Mrs. Seyfried was subdued, whether before or after she was loaded into the ambulance for transport.

left the house without further activity inside. Accordingly, no other Defendant officer – including Sergeant Letalien, Officer Cassels or Captain Powell – was involved with the protective sweep in any way.

### 1. Declaration Evidence

As the officer making the decision regarding a protective sweep, Lieutenant Moore attested that he responded to the home where the dispatcher reported an Alzheimer's patient had stabbed someone (Moore Decl. at 2, ¶ 4); that there was also a gun in the home (*id*.); was asked to "step it up" in responding by Sergeant Letalien, an "extraordinary request for an officer to accelerate the officer's response and respond in emergency fashion" (*id*., ¶ 6); that he parked nearby on arrival and while approaching the house, "heard a loud sound that I immediately recognized as a shot from a Less Lethal Shotgun" (*id*., ¶ 7). He attested that as he arrived, he was concerned that events were escalating and that the officers on scene were in danger. *Id*. at 3, ¶ 7. As he approached the driveway of the house, he observed Mrs. Seyfried holding a "metal dagger-like object in her hand (which I later learned was a metal letter opener)." *Id*., ¶ 8. Mrs. Seyfried had a "furious look" on her face and was "slobbering, clenching her teeth and clutching the letter opener with such force that I specifically remember seeing her knuckles were white from the grip." *Id*. She appeared determined to hurt either the officers present or Plaintiff, who was also present in or around the driveway. *Id*. Lieutenant Moore described the scene as "tense and chaotic," with both Seyfrieds yelling at the officers and Mrs. Seyfried yelling at Plaintiff and the officers shouting verbal commands to Mrs. Seyfried to drop the weapon, which she refused and continued in an aggressive stance and demeanor. *Id*., ¶ 9. He then attested to the sequence of events outlined above, resulting in Mrs. Seyfried being subdued and handcuffed. *Id*. at 3-5. During this time, he

attempted to control and talk to Plaintiff, who refused to answer any of Lieutenant Moore's questions. *Id*.

Lieutenant Moore continued to attempt to talk to Plaintiff after Mrs. Seyfried was handcuffed. *Id*. at 5, ¶ 15. He stated that the scene at that time remained chaotic and that Plaintiff "remained enraged and continued aggressively yelling and cursing at me." *Id*. Lieutenant Moore "detected a strong odor of alcoholic beverage on [Plaintiff's] breath," observed that he had blood shot watery eyes and slurred speech, and concluded he was intoxicated. *Id*. He asked Plaintiff whether anyone was inside the house or if anyone was injured, but Plaintiff remained "belligerent and uncooperative" and "refused to answer my questions." *Id*. at 5-6, ¶ 16. Based on those circumstances, not knowing whether anyone was inside the house Mrs. Seyfried had exited with the metal letter opener, understanding that someone had been stabbed at the scene, and understanding that "continued delay of emergency response would be detrimental" if someone were inside and injured, *id*. at 6, ¶ 17, Lieutenant Moore "believed that exigent circumstances existed to enter the home to determine if someone was inside seriously injured and in need of medical care." *Id*. He therefore requested Officers Reed and Hayney to "perform a brief and limited protective sweep of the home to locate anyone in the house who was injured." *Id*., ¶ 18. Lieutenant Moore remained for the moment with Plaintiff to continue to try to find out "what was going on." *Id*. After Officers Reed and Hayney had begun and were performing the protective sweep, Lieutenant Moore entered the back doorway of the house to assist in the protective sweep, but encountered the two officers who were completing the protective sweep and moving toward the back door. *Id*. at 6-7, ¶ 19.

Officer Coyle also responded to Lieutenant Moore's request and entered the back door of

44

the house for the purpose of assisting with the protective sweep, after Officers Reed and Hayney had commenced the sweep. Coyle Decl. at 2, ¶ 6. She understood that the other officers were already inside and "assumed that either consent had been given or that the events prior to my arrival justified the entry." *Id.* She entered the back door of the house but encountered the other officers who were completing the protective sweep; she stood at the doorway as the other officers walked toward it, and all exited the house. *Id.*, ¶ 7.

Officer Reed's Declaration comports with Lieutenant Moore's account. As Officer Reed attests, Lieutenant Moore requested him and Officer Hayney to conduct the protective sweep. Reed Decl. at 9, ¶ 33. He described the protective sweep:

> I entered the Seyfried home for the purposes of conducting a brief and limited protective sweep. When I entered, I was looking solely for anyone who was injured inside the home who may be in need of medical treatment. The scope of the sweep, for the entire duration, was limited to a search for injured persons. The Seyfried home was a two story house with several rooms on each floor. Ofc. Hayney and I quickly went room to room looking for an injured person. We did not look in closets, drawers, cabinets, or anywhere an injured person would not be found. Ofc. Hayney and I completed the sweep on the second floor, then immediately turned to exit the home. As we were exiting, we met other officers who were at the door way. We explained that we had completed the protective sweep and that no injured persons were found. At that time, all officers exited the house. From the moment Ofc. Hayney and I entered the home until we exited was less than five minutes.

*Id.* at 9-10, ¶ 34. Although Officer Reed does not mention it, it is undisputed that the officers used keys obtained from Plaintiff to open interior rooms that had been locked, according to Plaintiff, for the purpose of keeping Mrs. Seyfried from entering them.

### 2.     Analysis

The Court finds that exigent circumstances existed for the entry and that a protective sweep was objectively reasonable under the circumstances. Lieutenant Moore's decision to direct a

protective sweep was based on an objectively reasonable basis for believing that an occupant of the Seyfried house may be injured or in need of immediate medical attention. *Stuart*, 547 U.S. at 403; *Velasquez*, 2014 WL 2978535, at \*3. That is especially true given Plaintiff's reportedly hostile reaction to the officers present and his recalcitrance to answer Lieutenant Moore's questions. That assistance to a potentially injured occupant is a justifiable basis for a determination of exigent circumstances is well established. *Id.*; *Menchaca-Castruita*, 587 F.3d at 289. The ensuing protective sweep, as documented by Officer Reed, was "quick and limited" and for the purpose of searching the premises for the safety of possible third parties. *Albarado*, 555 F. App'x at 357; *Gould*, 364 F.3d at 581. In fact, the protective sweep was limited to the rooms in which a person could be and was completed within five minutes or less. Accordingly, Lieutenant Moore was correct in assessing the existence of exigent circumstances and the protective sweep itself was appropriately limited in nature and time.

Plaintiff argues the opposite, contending that "there was no reasonably trustworthy information, upon which the officer acted prior to entry into Plaintiffs' home, to warrant the officers believing that Plaintiffs had committed or were committing a crime." Response at 27. He goes on to "note that these officers already knew that this was a domestic disturbance between husband and wife and that nobody else was present in the home, but further, these officers had personal knowledge that nobody at the location had been stabbed." *Id*. at 28. Neither assertion carries Plaintiff's argument, however. Whether Lieutenant Moore or any other officer believed Plaintiff or Mrs. Seyfried had committed a crime is irrelevant; exigent circumstances justifying entry of the house was based on the possibility of endangered or injured third persons inside the house, given that Plaintiff refused to respond to any of Lieutenant Moore's questions. That is an

entirely sufficient ground for exigent circumstances, separate from suspicion of a crime. *Menchaca-Castruita*, 587 F.3d at 289 *Albarado*, 555 F. App'x at 356.   Plaintiff's contention that Lieutenant Moore, or any other officer present, "already knew" that the situation was a domestic disturbance between only Plaintiff and Mrs. Seyfried is not supported by any evidence, including Plaintiff's own Declaration.   Although he makes a brief statement that he told Officer Reed and Sergeant Letalien before Mrs. Seyfried exited the home that "nobody had been injured and that nobody needed medical attention," Seyfried Decl. at 2, ¶ 4, he did not advise the officers, or anybody else according to his declaration, that nobody else was inside the house and, obviously, he was not inside the house to see what Mrs. Seyfried was doing at that point.   He admits that his interaction with Lieutenant Moore was largely limited to "screaming" at him and "yelling and crying" while Plaintiff "didn't use nice words."   *Id.* at 3, ¶ 7.   He is correct in pointing out that Officer Reed had reported that "female did not actually stab anyone," which is recorded on the CAD Operations Report (MTD/MSJ Ex. 2 at 2); however, that report was based on Plaintiff's own statement to Officer Reed, who also observed that Plaintiff had a "fresh, bleeding cut on his arm" that he had obtained while "trying to wrestle the letter opener away from [Mrs. Seyfried]."   Reed Decl. at 3, ¶ 10.   Furthermore, there is nothing in evidence, or even present in Plaintiff's pleadings, to demonstrate that Lieutenant Moore was aware of Plaintiff's assertion that no stabbing had taken place.   Finally, Plaintiff's only accounting of the protective sweep was:

> After Delores was transported to the hospital, Officer Moore took my keys and gave them to Officers Hayney and Reed and they entered my house.   The officers used by [*sic*] keys to open the locked rooms in my house (which I have to lock to keep Delores contained and away from any unsafe objects).   Moore told me anytme [*sic*] that 911 was called that they had a right to search the house.   They never asked me for consent, they just did it.

Seyfried Decl. at 3, ¶ 11.   Plainly, he does not dispute Officer Reed's account of the nature of the

protective sweep, that he and Officer Hayney only entered rooms that could have contained an injured person to see if anyone was present, that they did not conduct any other search or look anywhere else, that Lieutenant Moore and Officer Coyle had only entered the back door when they encountered Officers Reed and Hayney completing the protective sweep and all then exited the house, or that the entire protective sweep took five minutes or less. He further does not attest that any seizure of any items had taken place or even that anything inside the house had been disturbed. His argument is without merit.

Accordingly, there was no constitutional violation and the officers present – whether attributed to the City of Lewisville as Plaintiff attempts to do or otherwise – made a proper determination that exigent circumstances existed and then executed a proper, and limited, protective sweep to ensure the safety of potential third persons who may have been present. There is "no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 247-48, and Defendants should be granted summary judgment on this issue.

### C.  Municipal Liability

Although Plaintiff asserts that the City of Lewisville is liable for the actions of the Defendant officers, the Court has found no Fourth Amendment violation was committed. Accordingly, the Defendant City cannot have been liable for the alleged violations.

### D.  Qualified Immunity

Because the Court has found no Fourth Amendment violations, it is not necessary to determine Defendants' claims of qualified immunity.

In summary, the officers acted with a great deal of restraint and professionalism under the most trying circumstances.

## IV.    RECOMMENDATION

It is therefore recommended that Plaintiff's objections to Defendants' Declaration evidence be overruled and that Defendants' objections to Plaintiff's Declaration evidence be overruled as moot; and that Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, viewed from the application of Fed. R. Civ. P. 56, should be **GRANTED** as to all counts, that judgment be entered on behalf of Defendants, and that Plaintiff should take nothing from this action.

Within fourteen days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations contained in the report.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court.   *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

**SIGNED this 28th day of August, 2014.**

_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE